Good morning. May it please the court, my name is Todd Master. I'm here for the As the papers indicate, this is a 1983 action. The appellant's argument is that the officers are entitled to qualified immunity and that the undisputed material facts support the two-part Saussure test in this particular instance. Looking at this totality of the circumstances objectively, which is what the court is required to do in order to apply qualified immunity, the appellants contend that based on the facts known to them, known to a reasonable police officer in the same or similar circumstances, that they would have had a reasonable basis to believe that the appellee, Mr. Hopkins, was in imminent danger of injury, possible life-threatening injury. The police officers had two options when they arrived that day. Option number one is to do what they did, and that is to err on the side of caution and safety, basically apply the standard identified by this Court in U.S. v. Black, which is better decide on the error of safety and the community caretaking function that police officers serve. On the safety issue, does the emergency exception to the warrant requirement apply every time a police officer receives information that someone's breath smells like alcohol? No, Your Honor. It does not. What distinguishes this case? Well, what distinguishes this case, Your Honor, is the fact pattern of the case. The police officers were called to a scene by an individual who was witnessed and was involved in a bizarre automobile accident. What was bizarre about the accident? What was bizarre about it was that the plaintiff was in a left-hand turn lane. Suddenly, there was a red light. They were unable to turn. Suddenly, went forward, hit the car in front of him, went back and hit the witness, and then fled the scene. Didn't he get out of his car and check for damage? Your Honor, what the officers were told by the witness was that he immediately fled the scene. What we learned afterwards were his indication. This was not known to the police officers at the time, so the police officers were unable to determine that, was that this woman indicated that the men fled and he proceeded after her or after him and followed him. And there's no obligation to check anything that a witness says before you break into someone's house? Well, Your Honor, looking at the U.S. v. Russell case, the court actually held in that case and rejected the argument that police obtained independent verification or some other information. Are you saying that he was in his car all the time? How did she have an opportunity to smell his breath? That's fine, Your Honor. What happened was she told the officers that she followed him home. He pulled into the driveway of his residence, got out of his vehicle. He told the officer, the woman told the officer, that she was close enough to smell his breath, saw him stumbling. He looked impaired. That was the information that she relayed to the officers. So she knew that he was in his house? Correct. She actually saw him go into the house. So that justifies the officers walking into the house? Well, the officers didn't just immediately walk into the house, Your Honor. They actually did investigate. They spoke with the woman, got her information in terms of what she saw, what happened. The officers then went to contact the plaintiff at the house, knocked on the door several times, no response. The officers got together, talked about what the next step would be. They decided to try another avenue of contact, going around the side of the house to knock on another door. Once again, no response. This case really mirrors the... Excuse me. Then they cut a hole in the screen door so they could reach in. And the screen door was locked, but the inner door was not. Is that correct? Well, my... That's how they got in? Well, my understanding, Your Honor, is there's a screen door or there's a screen and there's a door behind it. What I understand the officers did was they cut a small hole in the screen to be able to reach in, unlock the screen door and open it. I believe the other door was open so they could enter the house. That's correct. But the officers only did that after their reasonable attempts to try to make contact with the individual inside to ensure his safety. They were worried about what? They were worried about the possibility that he might be suffering from a diabetic emergency. And this emergency occurred at the time of the accident? At or before the time of the accident, Your Honor. It might have explained the reason for the accident. And how long does a diabetic emergency continue? Well, I think it varies. I think it starts and it can get worse. It can lead up to a coma, Your Honor. Well, I'm sure it can lead to a coma. Sure. But if you have an emergency diabetic attack, when is it before you pass out? Well, Your Honor, I can't answer that question. I mean, could it be two hours later that the emergency could occur? That's not what the officers understood. I believe they understood that it could happen sooner than that. And what their concern was they weren't getting any response from inside the house. I know. But I mean, if you're having an emergency diabetic attack that causes a bizarre accident, and you drive home and you go to your house, it can then occur after that? It could occur at any time, Your Honor. The officers weren't aware. Yeah, that's what I asked. You know, six hours later? No, I think, Your Honor, all the officers understood was what they were advised by the witness as to what she saw. But they had an emergency diabetes attack. Correct. Which preceded the accident. It could have. The officers did not know. Did she say that? No, she did not. I mean, what the ---- it's very common for people who are in an inebriated condition to go home and pass out. I can't see anything here that would make it indicate that this was not just that from a situation where someone is having ---- could be going into a diabetic coma and pass out. Right. Is there anything? Well, Your Honor, there isn't. That very well could have been a possibility, and the officers recognized that as being a possibility. But they also recognized the possibility that he could be suffering from something more than that. So if that's true, then everyone who is drunk and goes home can have his door opened and walk in if he's passed out. Well, Your Honor, I think that leads us to the other objective analysis that we need to look at here, which also favors the officer, which is the probable cause and exigent circumstances to go into a house to arrest for DUI. And the fact that the officers, looking at it reasonably and objectively, which is what you're required to do under the Saussure analysis, that they have the necessary probable cause to arrest for a vehicle code violation under California law, and that the People v. Thompson California Supreme Court case acknowledges that and is based on essentially the same facts, Your Honor. But in terms of the exigent circumstances ---- So that's the case that was after the accident, right? Correct. But what that case demonstrated was that there was no clearly established law in California for dealing with this situation. Well, the law is established in our circuit, in our cases, and the Supreme Court cases. Are you referring to the Welsh case, Your Honor? Well, among others, yes. Okay. Your Honor, the Welsh case, which is the case that's primarily the one that we've dealt with in this particular instance, is clearly distinguishable from here because you have Wisconsin DUI laws versus California DUI laws and what the compelling State interests are. And the California Supreme Court ruled that the interests in California are far much more compelling than they are in Wisconsin, given the gravity of the offense, and that's what the Supreme Court relied on. And, yes, Your Honor, our argument is that there is no clearly established law that would have indicated to these officers, let alone a reasonable officer, that what they did in these circumstances was not justified under the law. And if I may, I would like to save some time for rebuttal. Thank you. Good morning. I'm Tony Boscovich. I represent Bruce Hopkins. There are three. You're only representing Mr. Hopkins? Yes. He's the plaintiff and appellate. And no one here is representing Mr. Is it Nguyen? Oh, Mr. Baskin. All right. Yes. On the basis of this record, Mr. Hopkins contends that this Court can actually rule that there was definitely a Fourth Amendment violation, not just a tribal issue of fact, but a Fourth Amendment violation. You haven't asked for that, have you? We have not. All we did was oppose the motion. I just wanted to make certain. Yes. There are three important factors in this case. One, time. From the time the witness made the call until the time they broke in was 11 minutes and two seconds. From the time the call was made until the break-in, 11 minutes and two seconds. Second, what the quality of the information that these officers had. A person makes a cell phone call, describes an accident. The officers come out. There is no damage to the car. There's no indication that anybody has been driving. The person simply says, I was in an accident with this person. He's drunk. He's got slurred speech. I think he's drinking. He ran into that house. That's the sum total of the information that they have. Did they put their hand on the hood of the car to see if it was warmed? No. Did they check to see if there was damage? No. All they did was they went up to the door and knocked on the door. If that warrants any exception, we are all in danger. Because all I would have to do is to pick up my cell phone from somebody I don't know, call their house, say they're drunk, and the police can go in. That can't be the law. Next, investigation. What did they do in the 11 minutes and two seconds? They didn't determine if he was wearing a bracelet. They didn't determine if he had driven erratically. They didn't determine if the car's head damaged. Nothing. And they say that they're worried about a diabetic coma. They call emergency. They call fire and paramedics. Did they consult? No. Did they ask under these facts? No. They decided to go in to the man's house with guns drawn. Interestingly, the United States Supreme Court in 2006 in the city of that a misdemeanor is a very low-level exigency. There was no violence here. There was no injury here. The only potential exigency for them was dissipating evidence, and Chief Justice Roberts made it very clear that that's not a very good exigency. Every case that's upheld these exigent circumstances in community caretaking, it's either involved violence or some independent evidence known by the officers. These officers knew nothing of their own, literally nothing. Help me once they went into the house. What happened to Mr. Hopkins? Mr. Hopkins was in a basement. This is a busy street. The officers walked in with guns drawn. Officer Bonvaccino got at the low ready. Officer Bulow pointed. Did they arrest him? They arrested him. Well, yes. What they did was they handcuffed him. They secured him. They handcuffed him. They took him outside, and at that point they asked Ms. Tlaib to do a citizen's arrest because they did not feel that they, Officer Bonvaccino did not feel that they had the authority to arrest him at that time. Excuse me. Didn't they say in the house you're under arrest? Weren't there two arrests here? The arrest in the house and the arrest outside the house? There were two arrests. Absolutely there were two arrests. The problem was was the arrest for the hit-and-run accident would require the specific intent that you have knowledge that you've caused damage. They didn't have that. But they did come in and they took him out and put him under arrest for DUI. It's always unclear. Was he taken? Then was he prosecuted for that? He was charged, but there was no conviction. The charges were dismissed. Now I know why I wanted to ask about Mr. Doolittle. He didn't go in the house, did he? He did not. When the officers, when they went to the door and knocked, they came back and the three officers had a discussion of what their individual roles would be as to what their plan was going to be. Officer Nguyen, what he did was he was going to investigate the accident and stay with the reporting witness. Officers Buelow and Bonvaccino were going to make the entry. We contend that Officer Nguyen still has liability because he was a part of the plan to break in, even though he didn't break in himself. So we conceded no excessive force with respect to Officer Nguyen because he did not go in, he did not draw his gun. But certainly the Fourth Amendment violation to enter the house, he was part and parcel of the decision. And on that basis, I would simply say that there is a requirement for a little further investigation, especially in the case of this circuit in Arpin, and the Pang cases have made it clear there is a necessity. And there was no time urgency. This isn't like Graham versus Connor where they have to make a split-second decision. They don't. Somebody's sitting inside the house, fire's on the way, let's sit and talk, let's make a phone call. There was no danger. So on that basis, I believe that it's very clear the Fourth Amendment is violated. I'm sorry, I'm having a little trouble with the officer outside. Is there evidence that they said, first we're going to go up there, we're going to knock, and then if he's not there, we will drill a hole and open the door and go into the house? No. Or was it just that we're going to knock and see if he's there? The knocking had already occurred. They had knocked on the door. There is evidence that the officers actually attempted to kick the door down. Mr. Hopkins has said that the front door was actually broken. But the two officers, Officer Boncino went and knocked, came back, had a discussion with Officer Nguyen. All we know, all they remember, is they decided what they were going to do. Officer Nguyen went back to investigate with the lady, and Officers Boncino and Bulow immediately proceeded around the house, found the side door, cut open the screen, and went in. So the decision was made to go in. The methodology, probably not. Probably not. Thank you. Thank you, Your Honors. Quickly, just to clarify Officer Nguyen's involvement. He was involved in a meeting outside with the other two officers, at which time they directed him to investigate with the witness the actual accident, while the other two would try to make contact with the person inside. That was the extent of Officer Nguyen's involvement in the case. I would like to address the argument dealing with the timing here. When you're dealing with an emergency, timing is important. And the longer you wait, the more problematic it becomes. And the appellants contend that this case is on par with the Martin v. Oceanside case, wherein you had someone call the police and a father concerned about the safety of his daughter. That was all the officers knew. They hadn't heard from the dad. Well, at least somebody was concerned about safety there. Nobody told the police that they thought this man had a safety problem. Well, Your Honor, I think you're right. All they said was that they thought he had behaved erratically in an automobile accident, had driven home, and had alcohol on his breath. That's right, Your Honor. At least in the other case you're mentioning, they had reason to worry about the daughter. The person making the call did. You're correct, Your Honor. But these officers are trained more than the typical person dealing with these types of scenarios. They're trained to say that any time anyone has alcohol on his breath, he may be suffering a diabetic emergency. Well, given the nature of what happened prior to the officers' involvement, the accident, the fleeing of the scene, and those facts specifically, yes. The officers, I think a reasonable officer would be concerned for someone's safety who's unable to respond to the door. You know, the case that, you know, one of the arguments that the appellee made was that the person inside doesn't have an obligation to let the officers in without a warrant. That's undoubtedly true. But the one thing that could have happened here and which didn't happen, which is the individual inside simply exerting their rights not to talk to a police officer and indicating I'm fine, no need to come in, at that point it would be undisputed that the officers would not be able to come in. But the officers didn't have that. And as the U.S. v. Russell case talks about, the Martin v. Oceanside case, and the United States v. Black case in particular in this circuit, it's important that the officers not be second-guessed on these types of scenarios because this is exactly what we would want law enforcement officers doing, and that's taking care of the community. And I see that I'm out of time. Thank you. That's it. The case just argued is submitted. We'll hear the next case, which is Flores-Torres v. McKayson.
judges: Schroeder, Nelson, Reinhardt